04-53.063-SMH                                                    May 4, 2006

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ROTHSCHILD INVESTMENT CORP.,          )
a Delaware Corporation                )
                                      )
                    Plaintiff,        )
                                      )
              v.                      )        05 C 3041
                                      )
TRAVELERS CASUALTY and SURETY         )
COMPANY OF AMERICA, a Connecticut     )
Corporation,                          )
                                      )
                    Defendant.        )


**MEMORANDUM OPINION**

This matter is before the court for ruling on the cross-motions for summary judgment filed by plaintiff Rothschild Investment Corporation ("Rothschild") and defendant Travelers Casualty and Surety Company of America ("Travelers"). For the reasons that follow, the court grants Rothschild's motion and denies Travelers' cross-motion.

**BACKGROUND**[1]

Rothschild is a registered investment advisor and registered broker/dealer that provides a broad spectrum of financial investment services to its clients. Travelers is a stock insurance

_____

[1] The Background facts are undisputed unless otherwise noted and are based on the parties' respective Local Rule 56.1 Statements of Fact. The court further notes that all properly supported facts set forth in Rothschild's Local Rule 56.1 Statement of Uncontested Facts are deemed admitted due to Travelers' failure to respond. See N.D. Ill. L.R. 56.1(b)(3)(B).

- 2 -

company that issues various types of insurance policies, including but not limited to securities dealer fidelity bonds. On or about November 1, 2002, Travelers issued a Securities Dealer Fidelity Bond, number 103702933 ("the Bond"), to Rothschild. Pursuant to the Declarations for the Bond, the Limit of Liability was set at $500,000 with a deductible amount of $10,000. The Bond includes thirteen Insuring Agreements, lettered A through M, that set forth the coverage provided for various losses. For example, the Insuring Agreements describe the coverage available for: loss resulting from the dishonest or fraudulent acts of Rothschild's employees (Insuring Agreement A), loss of property on the premises or in transit due to robbery (Insuring Agreements B and C), loss resulting from forgery (Insuring Agreement D) and loss resulting from payments made based on unauthorized signatures (Insuring Agreement G). Regarding Insuring Agreements D and G, which are at issue in this case, the Bond provides that Travelers will indemnify Rothschild for:

    (D)  Loss resulting directly from:

        (1)  **Forgery** or alteration of, on or in any **Negotiable Instrument** (except an **Evidence of Debt**), **Acceptance**, **Withdrawal Order**, receipt for the withdrawal of **Property**, **Certificate of Deposit** or **Letter of Credit**; or

        (2)  transferring, paying or delivering any funds or **Property** or establishing any credit or giving any value on the faith of any written instructions or advices directed to the Insured and authorizing or acknowledging the transfer, payment, delivery or receipt of funds or **Property**, which instructions or advices purport to

- 3 -

have been signed or endorsed by any customer of the Insured or by a financial institution but which instructions or advices either bear a signature which is a **Forgery** or have been altered without the knowledge and consent of such customer or financial institution.

\* \* \* \* \* \*

(G) Loss resulting directly from the Insured having accepted, paid or cashed any checks or **Withdrawal Orders** made or drawn on a customer's account which bears the signature or endorsement of one other than a person whose name and signature is on file with the Insured as an authorized signatory on such account.

(Bond at 3-4, Compl. Ex. 1.) (Emphasis in original.) The Bond also includes a section entitled "Exclusions" that identifies which losses the Bond does not cover. Pursuant to Exclusion G, the Bond does not cover "loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized" (unless a Rothschild employee unlawfully withdraws and converts money from the customer's account). (Id. at 15.) Additionally, the Bond includes a provision in the General Agreements for reimbursement of certain "Court Costs and Attorneys' Fees" ("Defense Costs Provision") which states that:

[Travelers] will indemnify [Rothschild] against court costs and reasonable attorneys' fees incurred and paid by [Rothschild] in defense, whether or not fully litigated on the merits and whether or not settled, of any suit or legal proceeding brought against [Rothschild] to enforce [Rothschild's] liability or alleged liability on account of any loss, claim or damage which, if established against [Rothschild], would constitute a loss sustained by [Rothschild] covered under the terms of this bond.

- 4 -

(Id. at 10.)   The Defense Costs Provision, as modified by the parties, allows up to $500,000 of coverage for defense costs and fees.

In March 2003, after receiving notice from its client the Aldridge Electric, Inc. Profit Sharing Plan ("the Aldridge Plan") that certain Plan assets were missing, Rothschild, through its insurance broker, notified Travelers of a potential loss under the Bond.  On April 7, 2004, the Aldridge Plan sued Rothschild in the Circuit Court of Cook County for breach of fiduciary duty, professional negligence and breach of contract ("the Aldridge Plan Lawsuit" or "the Lawsuit").  Subsequently, after the Lawsuit was removed to the United States District Court for the Northern District of Illinois, the Aldridge Plan amended its complaint to assert just two counts, one count seeking restitution for ERISA violations resulting from Rothschild's alleged breaches of fiduciary duty, and a second count alleging that Rothschild was liable for professional negligence.

Both the original and amended complaints included allegations that an employee of Aldridge Electric Inc., Evelyn Lopez, had embezzled millions of dollars from funds that Rothschild held and/or administered on behalf of the Plan.  Lopez allegedly embezzled the funds in a variety of ways, including falsifying paperwork in order to create illegitimate loans, to create false withdrawals from Aldridge Plan accounts and to divert funds

belonging to Aldridge Plan participants who had left the company. The Aldridge Plan further alleged that Lopez was able to move funds out of the Plan through forged checks. More specifically, the Lawsuit included allegations that in order to embezzle funds from the Plan, Lopez instructed Rothschild to open a checking account to serve Plan rollovers, cash distributions and loans, forged a substantial number of checks in that account and forged the signatures of the Plan's authorized signatories — Thomas Lizzo and Kenneth Aldridge — on checks and other written instructions she remitted to Rothschild.

Rothschild forwarded a copy of the Aldridge Plan Lawsuit to Travelers on April 16, 2004. In a letter dated April 22, 2004, Travelers acknowledged its receipt of the Lawsuit and formally advised Rothschild that it was "exercising its right of election to not defend this litigation." (Compl. Ex. 3.) Rothschild then retained Sidley Austin Brown & Wood ("Sidley & Austin") as its defense counsel. Between July and October 2004, Rothschild and Sidley & Austin attempted to obtain reimbursement from Travelers for the attorneys' fees incurred to date for defense of the Lawsuit. During that time period, Sidley & Austin also forwarded a copy of the Aldridge Plan's amended complaint to Travelers. In a letter dated August 9, 2004, Travelers informed Rothschild, through Sidley & Austin, that, at that time, the Aldridge Plan Lawsuit did not appear "to constitute a loss under the bond" and

- 6 -

that "[t]o date, a covered loss under the bond has not been established." (Compl. Ex. 8.) After Rothschild, through its attorneys, submitted a preliminary proof of loss regarding attorneys' fees incurred to date, Travelers responded in a letter dated October 11, 2004, declining to reimburse Rothschild for the attorneys' fees and costs it had incurred. Reiterating the position it had taken in the August 9, 2004 letter, Travelers again stated that "a covered loss must be established" in order for the provision regarding coverage for attorneys' fees and costs to apply. (Compl. Ex. 10.) Then in a letter dated November 18, 2004 from Travelers' lawyers to Rothschild's lawyers, Travelers advised Rothschild of its coverage position, stating that it "has no duty to indemnify Rothschild with respect to [the Aldridge Plan Lawsuit.]" (Compl. Ex. 11.)

In order to mitigate its damages and eliminate any further financial risk from the Aldridge Plan Lawsuit, on December 8, 2004, Rothschild agreed to pay the Aldridge Plan $325,000 to settle the Lawsuit. In addition to the $325,000 settlement Rothschild paid to the Aldridge Plan, Rothschild paid a total of $234,276.40 in attorneys' fees and costs to Sidley & Austin for its services in defending against the Aldridge Plan Lawsuit. Subsequently, on or about February 11, 2005, Rothschild submitted a Supplemental Proof of Loss Form to Travelers, seeking reimbursement for the amounts paid to the Aldridge Plan and Sidley & Austin. To date, Travelers

has declined to reimburse Rothschild for either the attorneys' fees and costs or the settlement amount.

As a result, Rothschild commenced the lawsuit that is now before the court. In Count I, Rothschild alleges that by failing to reimburse defense costs to Rothschild, Travelers has breached its duty to defend in violation of the terms of the Bond and Illinois law. In Count II, Rothschild asserts that Travelers also breached the terms of the Bond by failing to indemnify Rothschild for the settlement payment.

In its pending motion for summary judgment, Rothschild asks the court to find that Travelers breached its duty to defend and thus grant summary judgment in favor of Rothschild on Count I of its Complaint against Travelers. Travelers, for its part, asks the court to grant summary judgment in its favor on both Counts I and II.

## DISCUSSION

### A.    Summary Judgment Standard

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering such a motion, the court construes the evidence and all inferences that

- 8 -

reasonably can be drawn therefrom in the light most favorable to the nonmoving party. See Pitasi v. Gartner Group, Inc., 184 F.3d 709, 714 (7th Cir. 1999). "Summary judgment should be denied if the dispute is 'genuine': 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Talanda v. KFC Nat'l Mgmt. Co., 140 F.3d 1090, 1095 (7th Cir. 1998) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "[U]nless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," there is no issue for trial. Anderson, 477 U.S. at 248.

**B.  Analysis**

In this case, the parties agree that there are no genuine issues of material fact precluding summary judgment and further agree that under Illinois law, which controls the outcome of this case, the construction of the terms of the Bond and the determination regarding their rights and obligations under the Bond are questions of law for the court to decide. See Roman Catholic Diocese of Springfield in Ill. v. Maryland Cas. Co., 139 F.3d 561, 565 (7th Cir. 1998). The only dispute is which party is entitled to summary judgment.

Rothschild maintains that there were allegations in the Aldridge Plan Lawsuit that if not clearly, then at least arguably, fell within Bond coverage, thus triggering Travelers' duty to pay Rothschild's defense fees and costs. By refusing to reimburse

Rothschild for those fees and costs, Travelers breached its duty to defend and thus is liable to Rothschild as a matter of law. As for Count II, Rothschild contends that if the court agrees that Travelers breached its duty to defend, the only remaining issue will be whether the $325,000 settlement payment to the Aldridge Plan was reasonable. According to Travelers, however, Rothschild's claimed loss relating to the Aldridge Plan Lawsuit is excluded from coverage under the Bond, so Travelers had neither a duty to defend the Lawsuit nor a duty to indemnify Rothschild for the amount of the settlement payment. Travelers thus argues that it is entitled to summary judgment on both counts of Rothschild's complaint.

**1.    The Duty to Defend and the Duty to Indemnify**

Whether Travelers had a duty to defend — or, more precisely, a duty to reimburse Rothschild for its defense costs — depends on the allegations raised in the Aldridge Plan Lawsuit.  As the Illinois Supreme Court has held:

> To determine an insurer's duty to defend its insured, the court must look to the allegations of the underlying complaints. If the underlying complaints allege facts within or *potentially* within policy coverage, the insurer is obligated to defend its insured even if the allegations are groundless, false, or fraudulent. An insurer may not justifiably refuse to defend an action against its insured unless it is *clear* from the face of the underlying complaints that the allegations fail to state facts which bring the case within, or potentially within, the policy's coverage.

United States Fid. & Guar. Co. v. Wilkin Insulation Co., 578 N.E.2d 926, 930 (Ill. 1991) (citations omitted); Roman Catholic Diocese,

139 F.3d at 565.  An "insurer's duty to defend is [thus] broader than its duty to indemnify and the insurer may be obligated to defend against actions which are not in fact covered under its policy." Tews Funeral Home, Inc. v. Ohio Cas. Ins. Co., 832 F.2d 1037, 1042 (7th Cir. 1987).  As long as at least one of the injuries alleged in the underlying complaint potentially falls within the scope of the policy, "the insurer must provide a defense against the entire complaint, even if one or more theories of recovery are specifically excluded under the policy."  Id. Moreover, the complaint against the insured must be construed liberally, and "any doubts as to the insurer's duty must be resolved in favor of the insured[.]" Roman Catholic Diocese, 139 F.3d at 565.

Because the duty to defend is broader than the duty to indemnify, the fact that an insurer has a duty to defend does not necessarily mean it also has a duty to indemnify.  See, e.g., Solo Cup Co. v. Fed. Ins. Co., 619 F .2d 1178, 1183-1184 (7th Cir. 1980).  A determination regarding the duty to indemnify generally is not made until the underlying litigation is terminated, whereas "the insurer must determine whether it has an obligation to defend at the outset of the litigation." Travelers Ins. Co. v. Penda Corp., 974 F.2d 823, 827 and 833 (7th Cir. 1992).  In the event an insurer believes the underlying complaint against its insured is beyond the scope of the policy's coverage, the insurer has three

- 11 -

options: "(1) it may seek a declaratory judgment relieving it of the obligation to defend; (2) it may defend the insured under a reservation of rights; or (3) it may do neither and risk a subsequent finding that it breached the duty to defend . . . ." Roman Catholic Diocese, 139 F.3d at 565. But if the insurer chooses the third option and the court later determines that the insurer breached its duty to defend, the insurer must then "indemnify the insured for any liability the insured incurs in the underlying action." Id. at 565-566. In other words, an insurer that breaches its duty to defend is estopped from arguing that it has no duty to indemnify. Id. at 566; Solo Cup, 619 F.2d at 1184.

In this case, Travelers did not seek a declaratory judgment regarding whether it had a duty to defend Rothschild in the Aldridge Plan Lawsuit. Nor did Travelers provide a defense for Rothschild under a reservation of rights, which it could have done either by providing defense counsel or reimbursing Rothschild for Sidley & Austin's legal services. The dispositive question, therefore, is whether Travelers had a duty to defend. If Travelers had no duty to defend, then it follows that it has no duty to indemnify Rothschild for the settlement paid to the Aldridge Plan. Crum & Forster Managers Corp. v. Resolution Trust Corp., 620 N.E.2d 1073, 1081 (Ill. 1993). Conversely, if Travelers had a duty to defend and breached that duty, it is liable both for attorneys' fees and costs Rothschild incurred to defend against the Lawsuit

and for the settlement paid to the Aldridge Plan (assuming that settlement was reasonable). See Guillen v. Potomac Ins. Co. of Ill., 785 N.E.2d 1, 14 (Ill. 2003) (when insurer breaches duty to defend, party seeking reimbursement for settlement must establish reasonableness of settlement).

### 2. The Allegations in the Aldridge Plan Lawsuit Triggered the Duty to Defend

According to Rothschild, Travelers had a duty to defend Rothschild against the Aldridge Plan Lawsuit because the allegations in the Lawsuit implicated Insuring Agreement D entitled "Forgery or Alteration" and Insuring Agreement G entitled "Unauthorized Signatures." Travelers disagrees, arguing that (1) the type of loss claimed in the Aldridge Plan Lawsuit is excluded from coverage by Exclusion G which excludes losses resulting from transactions in a customer's account, and (2) the loss is an indirect loss rather than a direct loss to Rothschild, and thus is not covered under the terms of the Bond. For the reasons that follow, the court concludes that Travelers had a duty to defend Rothschild against the Lawsuit.

First and foremost, the court agrees that the allegations in the Aldridge Plan Lawsuit at least arguably, if not clearly, implicated coverage under Insuring Agreement D pertaining to

- 13 -

forgery.[2]  According to the underlying complaint, Lopez instructed Rothschild to open a checking account to serve Plan rollovers, cash distributions and loans, then forged a substantial number of checks in that account and forged the signatures of the Plan's authorized signatories — Thomas Lizzo and Kenneth Aldridge — on checks and other written instructions she remitted to Rothschild.  Through these acts of forgery, the complaint alleged, Lopez embezzled funds from the Aldridge Plan's accounts.  Such allegations implicate Insuring Agreement D, under which the Bond provides coverage for losses resulting directly from "transferring, paying or delivering any funds . . . or establishing any credit or giving any value" based on forged instructions or advices.

### a. It is not "Clear and Free from Doubt" that Exclusion G Applies

Travelers' arguments to the contrary do not persuade the court to rule otherwise.  In its first line of defense, Travelers asserts that the losses alleged in the Lawsuit resulted from transactions in the Aldridge Plan's accounts, and thus are expressly excluded from coverage pursuant to Exclusion G.  Under Exclusion G, as relevant here, the Bond does not cover losses that result "directly or indirectly from transactions in a customer's account, whether authorized or unauthorized[.]"  In order for Travelers to avoid its

_____

[2]/  The court thus finds it unnecessary to address whether the underlying complaint also implicated Insuring Agreement G regarding losses resulting from Unauthorized Signatures.

- 14 -

duty to defend based on a policy exclusion, however, it must be "free and clear from doubt" that the exclusion applies. Sethness-Greenleaf, Inc. v. Cigna Prop. & Cas. Ins. Co., No. 94 C 6002, 1995 WL 571866, at *5 (N.D. Ill. Sept. 22, 1995) (citing Hurst-Roche Eng'rs v. Comm. Union Ins., 51 F.3d 1336, 1342 (7th Cir. 1995)). An exclusion from coverage is enforceable "only where the terms are clear, definite, and explicit." Econ. Fire & Cas. Co. v. Kubik, 492 N.E.2d 504, 507 (Ill. App. Ct. 1986). Conversely, if an exclusion is subject to more than one reasonable interpretation and is thus ambiguous, the exclusion must be construed against the insurer and in favor of the insured — i.e., in favor of coverage. Am. States Ins. Co. v. Koloms, 687 N.E.2d 72, 75 (Ill. 1997). Here, Travelers cannot meet its burden of proving that the claims in the underlying Lawsuit clearly fall within Exclusion G. See Sethness-Greenleaf, 1995 WL 571866 at *5 (insurer invoking exclusion bears burden).

According to Travelers, the losses at issue here clearly resulted from "transactions in a customer's account" and thus fall within Exclusion G. Lopez's scheme involved buying, selling and liquidating securities, transferring funds to the checking account she directed Rothschild to open, and withdrawing funds from that checking account. Buying, selling and liquidating securities are all transactions in the securities context, Travelers' argues, just as checking account transactions include making deposits and

- 15 -

withdrawals.  Thus, because Lopez's scheme involved transactions in
the Aldridge Plan's accounts that resulted in losses to those
accounts, the losses are excluded from coverage under Exclusion G.

Although Travelers' construction of Exclusion G seems logical
at first glance, consideration of the Bond as a whole demonstrates
that it is not "clear and free from doubt" that the exclusionary
clause applies.  Id.  "In construing an insurance policy, the
primary function of the court is to ascertain and enforce the
intentions of the parties as expressed in the agreement."  Crum,
620 N.E.2d at 1078.  "To ascertain the intent of the parties and
the meaning of the words used in the insurance policy, the court
must construe the policy as a whole, taking into account the type
of insurance for which the parties have contracted, the risks
undertaken and purchased, the subject matter that is insured and
the purposes of the entire contract."  Id.  Here, as Rothschild
points out, if Travelers' broad construction of Exclusion G were
correct, the exclusion would vitiate coverage otherwise provided
under the Bond.

Travelers contends that "Exclusion G excludes all losses to a
customer's account provided these losses were not caused by the
unlawful withdrawal or conversion of Money by a Rothschild

employee."[3]   (Def.'s Joint Resp. at 9.)   This construction is inconsistent with coverage specifically provided under the terms of the Bond, however.   Consider the following example.   Insuring Agreement D provides coverage for losses resulting from situations in which Rothschild transfers, pays or delivers funds based on forged instructions.   So if Rothschild processes a withdrawal from a customer's account and the withdrawal instruction turns out to be a forgery, the loss to the customer's account arguably should be covered under the terms of Insuring Agreement D.   But if we accept Travelers' construction, a withdrawal is one type of "transaction in a customer's account," so Exclusion G would trump Insuring Agreement D and exclude coverage unless a Rothschild employee committed the forgery.   Such a result simply is not consistent with other provisions of the Bond.   For one thing, nothing in Insuring Agreement D limits coverage to forgery committed by Rothschild employees.   More significantly, Travelers' suggestion that losses resulting from forgery are covered only if a Rothschild employee commits the forgery is inconsistent with the exclusion that specifically addresses forgery, Exclusion A.   Exclusion A provides that losses resulting from forgery are covered under the Bond as long as the losses fall within the scope of Insuring Agreement A(1), D, E or F.   Of those four Insuring Agreements, only Insuring

_____

[3]   As noted earlier, there is a limited exception to Exclusion G that provides coverage for losses resulting from transactions in a customer's account if a Rothschild employee unlawfully withdraws and converts money from the customer's account.   That exception is not applicable here.

- 17 -

Agreement A(1) directly pertains to dishonest or fraudulent acts committed by Rothschild employees.[4]  Insuring Agreements D, E and F (regarding losses relating to forgery, securities and counterfeit currency, respectively), in contrast, are not limited to employee misconduct.  Under the plain terms of Exclusion A, coverage for losses resulting from forgery is not limited to forgery committed by Rothschild employees.  Construing Exclusion G to impose such a limitation would render Exclusion A superfluous — a result which makes no sense, particularly given that Exclusion A, not Exclusion G, is specific to forgery.  See Dowd & Dowd, Ltd. v. Gleason, 693 N.E.2d 358, 368 (Ill. 1998) ("Courts will generally avoid interpretations that render contract terms surplusage[.]").

Nor can we reconcile Travelers' construction of Exclusion G with the coverage provided under Insuring Agreement G.  Insuring Agreement G provides coverage in the event that Rothschild accepts, pays or cashes any check drawn on a customer's account which bears an unauthorized signature.  If Rothschild permits an unauthorized person to cash a check drawn on a customer's account, the customer's account would incur a loss and Rothschild would be liable to its customer to reimburse the loss.  Without insurance, Rothschild would have to reimburse the customer out of its own

---

[4]/  At one point, Rothschild suggests that the Lawsuit may also have triggered coverage under Insuring Agreement A(1), contending that allegations in the Lawsuit could be construed as suggesting a conspiracy between Lopez and a Rothschild employee.  (See Pl.'s Reply at 9.)  We reject this argument without further discussion because it lacks any basis in fact — there are no allegations in the Lawsuit that imply such a conspiracy.

- 18 -

funds, whereas under the Bond, the loss at least arguably should be covered under Insuring Agreement G (subject to the applicable deductible and limit of liability). However, that would not be the result if we accepted Travelers' construction of Exclusion G. Accepting, paying or cashing a check on a customer's account constitutes a "transaction in a customer's account" under Travelers' argument, thus implicating Exclusion G. And under Travelers' construction of Exclusion G, there is no coverage under Insuring Agreement G unless the transaction involves a Rothschild employee's fraudulent or dishonest conduct. Like Insuring Agreement D, Insuring Agreement G is not directed at instances involving a Rothschild employee's fraudulent or dishonest conduct, yet Travelers would impose such a limitation through Exclusion G. That construction essentially would nullify the coverage provided by Insuring Agreement G — a result that is inconsistent with the purposes of the Bond when considered as a whole.

     In the court's view, it is not "clear and free from doubt" what types of losses Exclusion G is intended to exclude. The exclusion refers to losses stemming directly or indirectly "from transactions in a customer's account, whether authorized or unauthorized[.]" (Bond at 15, Compl. Ex. 1.) As discussed above, we cannot accept Travelers' broad construction of the language because to do so would eviscerate coverage otherwise provided under the Bond. See Lincoln Logan Mut. Ins. v. Fornshell, 722 N.E.2d

- 19 -

239, 242 (Ill. App. Ct. 1999) (rejecting proposed construction of exclusionary clause that would contradict and swallow coverage otherwise provided under insurance policy.) Nor are we persuaded by Rothschild's narrow construction of Exclusion G. According to Rothschild, Travelers' construction "grossly expand[s] the definition of the word 'transaction' beyond its common meaning in the securities industry" where "transaction" clearly means "to buy, sell and exchange" securities. (Pl.'s Combined Reply at 6.) Although we are not persuaded that either party's construction of Exclusion G is necessarily correct, we are persuaded that Exclusion G is reasonably susceptible to more than one interpretation and is thus ambiguous. Am. States Ins. Co., 687 N.E.2d at 75. Accordingly, because it is not "free and clear from doubt" that Exclusion G applies, Travelers cannot avoid its duty to defend by relying on Exclusion G. Sethness-Greenleaf, 1995 WL 571866 at *5.

- 20 -

### b.  Travelers' Direct-Loss Argument is Unpersuasive

As noted earlier, the Bond covers Rothschild for losses "resulting directly from" various identified conduct or events, such as forgery, unauthorized signatures, robbery, burglary or fraudulent and/or dishonest acts committed by a Rothschild employee.  Based on the "resulting directly from" language, Travelers argues that it had no duty to defend Rothschild because the losses at issue in the Aldridge Plan Lawsuit were only indirect losses to Rothschild — the direct losses were incurred by the Aldridge Plan, a third-party whose losses, Travelers contends, do not fall within the scope of the Bond's coverage.  Rothschild counters that the Bond provides coverage both for loss of the insured's property as well as loss of property belonging to third parties that is in the insured's possession.  For the reasons explained below, the court agrees with Rothschild.

As an initial matter, although Travelers cites several general propositions of law regarding the differences between fidelity bonds and liability insurance policies in support of its position, these general propositions are unpersuasive.  According to Travelers, a fidelity bond "provides first party coverage [to the insured] for loss it sustains as a result of the fraudulent or dishonest acts of its employees" whereas liability insurance "provides coverage to the insured for its liability to third parties."  (Def.'s Joint Resp. at 7.)  In making this point,

- 21 -

Travelers cites <u>Aetna Casualty & Surety Co. v. Kidder, Peabody Co.</u> <u>Inc.</u>, 676 N.Y.S. 2d 559, 565 (N.Y.A.D. 1998), where the New York Supreme Court stated that "a fidelity bond is not a liability policy within the meaning of Insurance Law." In <u>Aetna</u>, the question presented was whether the fidelity provision of a bond provided coverage for insider trading committed by the insured's employee that caused losses to third parties. In ruling that coverage under the fidelity provision was not triggered, the <u>Aetna</u> court explained that the historical purpose of fidelity provisions "was to protect employers from employee-thieves who steal from the employers, but not from the consequences of unauthorized trading activity, for which other coverage could be purchased." <u>Id.</u>

Travelers' reliance on <u>Aetna</u> is flawed, however, because Travelers overlooks the fact that even though the Bond is entitled a "Securities Dealer Fidelity Bond," the Bond provides more than fidelity coverage. In <u>Aetna</u>, the sole provision at issue was the bond's fidelity provision. In this case, in contrast, Rothschild's claims do not arise under the Bond's fidelity provision. The fidelity provision — Insuring Agreement A(1) – provides coverage for loss of Property held by the Insured where the loss results directly from the dishonest or fraudulent acts of a Rothschild employee. But Insuring Agreement A(1) is just one of the fifteen Insuring Agreements, most of which are not limited to losses

- 22 -

resulting from dishonest acts of the Insured's employees.[5]  See id. at 564 (recognizing that bond contained additional provisions for coverage beyond fidelity coverage); see also, RBC Dain Rauscher, Inc. v. Fed. Ins. Co., 370 F. Supp. 2d 886, 890 and n. 3 (D. Minn. 2005) (bond coverage included coverage for loss of third party's property in insured's possession).  Because the Bond's fidelity provision is not at issue, the Aetna court's discussion regarding the historical purposes of fidelity coverage and its ruling regarding the scope of coverage under a particular fidelity provision have little, if any, bearing on this case.

Indeed, if the Bond precluded coverage for situations in which Rothschild was liable for losses of its customers' assets, the Defense Costs Provision in the Bond would be meaningless.  The Defense Costs Provision offers Rothschild protection against claims made by third parties.  Yet if losses of a third-party's assets never were covered under the Bond, the Defense Costs Provision never would be triggered.[6]

---

[5]  For example, through Insuring Agreement D the bond covers loss of property resulting directly from forgery; coverage under that provision is not limited to forgery committed by a Rothschild employee.  Similarly, the Bond provides coverage for loss of property on the premises or in transit resulting from burglary; that coverage is not limited to burglary committed by a dishonest Rothschild employee.  (Insuring Agreements B and C.)

[6]  In Aetna, as in this case, there were other bond provisions that covered the insured for third-party losses in connection with the loss of property the insured held on behalf of third-parties.  Aetna, 676 N.Y.S. 2d at 564.  But unlike this case, in Aetna the insureds' claims did not arise under those other provisions.  Id.

- 23 -

Furthermore, although Travelers contends that the settlement Rothschild paid to the Aldridge Plan constitutes an indirect loss rather than a "loss resulting directly from" conduct, events or activities that fall within any of the Bond's insuring provisions, we cannot agree.[7]  The language "loss resulting directly from" means the actual depletion of the insured's funds caused by conduct that falls within one of the Bond's insuring provisions.  <u>Fed. Deposit Ins. Corp. v. United Pac. Ins. Co.</u>, 20 F.3d 1070, 1080 (10th Cir. 1994).  In other words, the insured must incur an actual pecuniary loss as opposed to a bookkeeping or theoretical loss. <u>Id.</u>  Thus, for example, in a case involving coverage under a fidelity provision, an employee's fraudulent acts must cause the pecuniary loss.  <u>Id.</u>  Likewise, for there to be a direct loss in the case at bar under Insuring Agreement D, forgery must have caused Rothschild to incur an actual pecuniary loss.  "'[L]oss' occurs at the time of the activity giving rise to a claim against

---

[7/]  Additionally, to the extent that Travelers' argument regarding "first party" or "direct" losses suggests that Rothschild is entitled to indemnity under the Bond only to recover losses of its own assets, not losses of third-parties' assets held by Rothschild, such an implication is contrary to the terms of the Bond.  For example, Insuring Agreement E regarding securities provides coverage for loss sustained if the Insured "for its own account <u>or for the account of others</u>" acquires, sells, delivers or gives value based on an original certificated security that is forged, altered, lost or stolen.  (Insuring Agreement (E)(1) (emphasis added.))  This language indicates that there is coverage under the Bond not only for loss of Rothschild's own assets but also for loss of its customers' assets.  Similarly, the Bond provides coverage for property that stolen while deposited with Rothschild, (<u>see</u> Insuring Agreement B(1)), and for loss of property "held by the Insured" where the loss results directly from the fraudulent or dishonest conduct of a Rothschild employee, (Insuring Agreement A(1)).  Coverage is not limited to losses of Rothschild's own assets.  <u>See</u> <u>RBC Dain Rauscher</u>, 370 F. Supp. 2d at 890 and n. 3 (bond included provisions covering loss of third party's property in insured's possession); <u>Aetna</u>, 676 N.Y.S. 2d at 564 (same).

- 24 -

the insured," not at the time of settlement, trial or entry of judgment. Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d at § 160.61 (2005); RBC Dain Rauscher, 370 F. Supp. 2d at 890 (quoting id. and rejecting insurer's defense that settlement insured paid to third party was an indirect loss and thus not covered under bond's fidelity provision). To determine whether a loss is a direct loss, the majority of federal courts apply a conventional proximate-cause test. Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 854 A.2d 378, 386-387 (N.J. 2004) (collecting cases).

Applying these principles to the case at bar, the court concludes that the loss at issue at least potentially constitutes a direct loss under the Bond, thus triggering Travelers' duty to defend. Specifically, a loss occurred when Rothschild processed and cashed forged checks submitted by Lopez and thus became potentially liable to the Aldridge Plan. See RBC Dain Rauscher, 370 F. Supp. 2d at 890. The loss was an actual pecuniary loss, not merely a bookkeeping or theoretical loss, because Rothschild had to pay the Aldridge Plan $325,000 to settle the claims against it. Finally, under a traditional proximate-cause analysis, there is a sufficient link between Lopez's alleged forgery and Rothschild's pecuniary loss to implicate coverage under Insuring Agreement D.

Travelers disagrees, urging the court to conclude that the settlement constituted an indirect rather than a direct loss.

- 25 -

Quoting RBC Mortgage Co. v. National Union Fire Insurance Co. of Pittsburgh, 812 N.E.2d 728, 736-737 (Ill. App. Ct. 2004), Travelers argues that under Illinois law, a direct loss — i.e., a "'loss resulting directly from'" — is a "narrower concept than a 'proximately caused loss.'" The Illinois appellate court in RBC Mortgage explicitly rejected utilizing a proximate-cause analysis to determine whether a loss was direct, reasoning that such an analysis "was too broad to capture accurately the intent behind the phrase 'loss resulting directly from.'" 812 N.E.2d at 736-737. In reaching its decision, the RBC Mortgage court relied on Auto Lenders Acceptance Corp. v. Gentilini Ford, Inc., 816 A.2d 1068, 1073 (N.J. App. Ct. 2003), rev'd in part, 854 A.2d 378, 386-87 (N.J. 2004), a case in which the New Jersey appellate court likewise rejected the proximate-cause analysis. However, shortly after the RBC Mortgage court issued its opinion, the New Jersey Supreme Court reversed the appellate court's decision in Auto Lenders to the extent that decision rejected application of a proximate-cause analysis. Auto Lenders, 854 A.2d at 386-87.

According to the parties and the court's independent research, RBC Mortgage appears to be the only Illinois case to address the direct-loss issue. But given the RBC Mortgage court's reliance on a case that is no longer good law, and in light of the fact that the majority of federal courts utilize the traditional proximate-cause analysis to determine whether a loss is direct for insurance

purposes, <u>Auto Lenders</u>, 854 A.2d at 386-87, we are not persuaded that the Illinois Supreme Court would follow the <u>RBC Mortgage</u> court's rationale and reject the proximate-cause analysis.  <u>See</u> <u>Mason v. Ashland Exploration, Inc.</u>, 965 F.2d 1421, 1424 (7th Cir. 1992) (in the absence of a controlling state court decision, the task of a federal court sitting in diversity is to predict how the Illinois Supreme Court would decide case).

Declining to follow <u>RBC Mortgage</u>, we conclude that a sufficient causal link existed between the forgery alleged in the Aldridge Plan Lawsuit and Rothschild's pecuniary loss to implicate potential coverage under Insuring Agreement D of the Bond regarding forgery.  Travelers therefore had a duty to defend the Lawsuit, which it breached.[8]  Consequently, the court grants summary judgment in favor of Rothschild on Count I.

### 3. Because Travelers' Breached its Duty to Defend, It is Obligated to Indemnify Rothschild

Because Travelers' breached its duty to defend, it also has a duty to indemnify.  <u>Roman Catholic Diocese</u>, 139 F.3d at 565-566; <u>Solo Cup</u>, 619 F.2d at 1184.  Travelers' motion for summary judgment on Counts I and II is therefore denied.  Travelers is liable both for the attorneys' fees and costs Rothschild incurred to defend

---

[8] As explained earlier, when determining whether Travelers had a duty to defend, the issue is whether the claims in the underlying Lawsuit *potentially* fall within policy coverage, not whether the loss at issue definitively is covered under the policy.  <u>E.g.</u>, <u>United States Fid. & Guar.</u>, 578 N.E.2d at 930-931.  The court expresses no opinion regarding whether the loss was, in fact, a "loss resulting directly from" forgery under the Bond because we need not reach that issue.

- 27 -

against the Lawsuit as well as the settlement paid to the Aldridge Plan, provided that settlement was reasonable. See Guillen, 785 N.E.2d at 14. As Rothschild aptly points out, the reasonableness of the settlement is the only open issue in this case.

### CONCLUSION

For the reasons explained above, the court grants Rothschild's motion for summary judgment as to liability on Count I and denies Travelers' motion for summary judgment on Counts I and II. This matter is set for status on May 24, 2006 at 11:00 a.m. to address how to proceed regarding the reasonableness of the settlement Rothschild paid to the Aldridge Plan.[9]


DATED:    May 4, 2006


ENTER:    _____
          John F. Grady, United States District Judge

---

[9]  In the event Travelers has any questions regarding the reasonableness of the $234,276.40 in fees and expenses that Rothschild paid Sidley & Austin to defend the Lawsuit, that issue can also be addressed at the status hearing on May 24, 2006.